UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

UNITED STATES OF AMERICA,

                -against-                          18 CR 373 (RJS)

TYREEK OGARRO,

                Defendant.

------------------------------------------------------------- X

## MEMORANDUM IN AID OF SENTENCING
## ON BEHALF OF TYREEK OGARRO

      Defendant Tyreek Ogarro submits this memorandum in aid of his sentencing, scheduled for January 29, 2020. For the reasons set forth below, it is respectfully requested that the Court impose upon Mr. Ogarro a below-Guidelines sentence, as recommended by the Probation Department.

      While the charges in this case are serious, we believe that once the Court has a full understanding of the true scope of Mr. Ogarro's conduct, it will agree with the defense's sentencing recommendation. Mr. Ogarro was not a true member of the Drug Trafficking Organization ("DTO"), had no supervisory or leadership role, and certainly had no ownership stake in the DTO. Indeed, we submit his participation was minimal. Moreover, Mr. Ogarro was neither charged with nor convicted of a violent crime.

      Mr. Ogarro accepts full responsibility for his conduct and nothing herein is intended to minimize or excuse it. He is truly remorseful for his actions and the last 19-plus months in the Metropolitan Correctional Center ("MCC") have been an eye-opening experience as well as an opportunity to turn a corner. Tyreek has begun making significant efforts that will help him live a law-abiding life and be able to provide for his seven year old son. He has studied extremely

diligently and (proudly) obtained his GED earlier this month. He has also participated in nearly 30 courses offered at the MCC, including the non-residential drug treatment program.

It is respectfully submitted that when the Court considers all of the facts relevant to Mr. Ogarro's sentencing, it will find that a sentence of 36 months is "sufficient but not greater than necessary," to meet all of the sentencing goals embodied in 18 U.S.C. § 3553(a).

## I.     BACKGROUND

### A.     Mitigation Report

To better understand Tyreek's history and background, and why he currently finds himself before the Court, defense counsel engaged the services of Mitigation Support Services. The Mitigation Report prepared by Mitigation Support Services is exhaustive and thorough in its collection of background information regarding Tyreek's upbringing and life trajectory. We respectfully submit that the Mitigation Report strongly supports our position that a long prison term is not what Tyreek needs, nor would it serve the purposes of the sentencing statutes and Guidelines. While we cite to and refer to the report below, the Mitigation Report is attached in its entirety as Exhibit A.

### B.     Mr. Ogarro's Personal History

Tyreek Ogarro turned 28 years old on January 13, 2020. His early years were that of a normal child, although his mother relied on public assistance to help the family support itself. Tyreek's parents, who never married, separated after ten years due to his father's infidelities. Tyreek was seven years old at the time – the same age as Tyreek's own son. After his parents' separation, Tyreek's father was hardly present in his life, and did not pay Court ordered child support.

When he was 11 years old, Tyreek's mother was granted Section 8 housing benefits and he and his mother moved to Crown Heights, Brooklyn. Tyreek's earliest memories of Crown Heights are of violence and drugs. Tyreek walked by himself the one mile to his middle school. On one occasion, he was approached by two boys who tried to rob him. Tyreek tried to prevent them from stealing from him and the two boys began to assault him. Luckily, a woman noticed the altercation and came to Tyreek's aid. Unfortunately for Tyreek, this was not a one-time thing. The two boys regularly tormented Tyreek on his walks to and from school. The two boys, perhaps unsurprising, were later well known to the local police. See Mitigation Report at pp. 8-9 and Exhibit 2.

His mother began dating someone new, and he moved in with Tyreek and his mother. Unfortunately, their relationship has been filled with problems and Tyreek regularly witnessed loud arguments that sometimes turned physical. See id. at pp. 9 - 10. When the police were called by neighbors, nothing ever came of it. See id. at p. 10. Tyreek felt a distance forming between him and his mother as he viewed her as always talking her boyfriend's side, even though he was abusing her.

Tyreek attended Foundation High School. As detailed in the Mitigation Report, the high school was later closed due to poor performance and low attendance rate of students. Students reported feeling unsafe at the school due to numerous acts of violence. Tyreek did not do well academically and was barely passing with a 65 average. Unfortunately, the school did nothing to provide assistance to Tyreek, such as tutoring or afterschool programs. In the tenth grade, Tyreek's attendance began to plummet and he was not promoted to the 11th grade. With failing grades and no motivation, Tyreek saw no reason to continue his education and eventually dropped out of high school.

With his relationship with his mother becoming more and more estranged, Tyreek found comfort among his friends, who also unfortunately introduced him to drugs. Tyreek began smoking marijuana daily and also experimented with ecstasy and MDMA. Unsurprisingly, soon thereafter, Tyreek had his first interaction with the criminal justice system, when he was arrested for possession of marijuana.

One year later, Tyreek learned that he and his longtime girlfriend were having a child. Tyreek was only 19 years old, but knew that he needed to seek employment to be able to provide for his family. He began working construction with his 26 year old uncle, Duane. Tyreek enjoyed going to work with his uncle and the bond the show shared already had grown even stronger. In the absence of a fatherly presence, Duane was a positive influence in Tyreek's life.

Tragically, a few short months later, tragedy stuck Tyreek's family when Duane was gunned down by the police. See Mitigation Report at p. 13. Tyreek turned 20 the day after his uncle's death and recalls the deep sadness he felt and continues to feel every birthday as it is a reminder of his uncle's tragic passing. Four months later, Tyreek's son was born. Tyreek recounts that day as the "best day of his life." Id. While Tyreek is no longer in a relationship with the child's mother, he maintained a constant presence in his son's life until his arrest. See Exhibit B[1], Letter of Richard Brown, (discussing how Tyreek has been "an intimate part" of his son's life). Sadly, Tyreek has only seen his son twice since he has been incarcerated on this instant case as the child's mother does not like bringing him to the MCC.

Despite becoming a new father, Tyreek didn't have the strength to stop using drugs. Instead, his drug use intensified as he battled with undiagnosed depression – likely due to his estrangement from his mother and his uncle's death. See Exhibit B, Letters of D████ B████

---

[1] All of the character letters submitted on Mr. Ogarro's behalf are attached alphabetically by the writer's last name as Exhibit B.

and Maziyah O'garro (discussing Tyreek's depression and the change in him after the passing of his uncle). Tyreek began abusing opioids and became addicted. He recounted that the pills were the only way to relieve his pain. During his drug-induced days, Tyreek befriended a homeless man in his neighborhood. See id. at p 14. The two would smoke an excessive amount of marijuana together – sometimes as many as 10 - 15 blunts in a single day. However, when Tyreek rejected the man's requests to come to his home, Tyreek and his family were on the receiving end of a string of violence. See id.

After several incidents, Tyreek's mother felt her son's safety was in jeopardy and moved the family out of the neighborhood. See id. Tyreek's relationship, however, with his mother's boyfriend worsened to the point that he called the police on Tyreek several times; eventually leading to Tyreek's arrest. See id. at p. 15. Tyreek was forced to move out of his mother's house and he lived with a friend. However, his mother suffers from seizures and Tyreek returned to live with her so that he could care for her.

In June 2016, Tyreek was arrested and charged with criminal possession of a weapon. Tyreek maintained that the gun (which was found in a cab in which he was a passenger) was not his and took his case to trial. In January 2017, he was convicted after a bench trial and sentenced to six months in prison. Upon his release, he lived with his mother and her boyfriend, but the household was hostile and Tyreek avoided his mother's boyfriend as much as possible.

While on probation on the state case, Mr. Ogarro attended programs at both the Osborne Association and St. Nicks Alliance. In order to be accepted into St. Nick's Alliance, Tyreek has to pass drug tests, as well as reading and math tests. Shortly before his arrest in the instant case, through the Osborne Association, Mr. Ogarro interviewed for a job at Manhattan Maid, a cleaning services company.

### C.      Mr. Ogarro's Post-Arrest Conduct

Tyreek has been incarcerated at the MCC since June 6, 2018. He has received no disciplinary infractions. To the contrary, Mr. Ogarro has used these many months to better himself and plan for a positive future.

First, he has been studying extremely hard for his High School Equivalency Credential ("GED"). He passed all four sections and earned his GED earlier this month. Tyreek has also taken advantage of the various programs offered by the MCC. He has completed nearly 30 programs, including Marketing Basics, Sales Fundamentals and Business Ethics. See Mitigation Report, Ex. 6. By the end of this month, he is expected to successfully complete the Non-Residential Drug Abuse Program ("NRDAP"). The Non-Residential Drug Abuse Program is an intensive six month program, where participants are required to identify their problems, set goals and means of addressing their problems and achieving their goals.

### D.      The Offense Conduct and Plea Agreement

On May 14, 2019, pursuant to a written plea agreement, Mr. Ogarro pleaded guilty to the lesser included offense within Count One, narcotics conspiracy pursuant to 21 U.S.C. § 841(b)(1)(C).

He pleaded guilty and accepts responsibility. Nothing stated herein is meant to take away from that. However, we do believe that certain facts surrounding the offense conduct are relevant to his sentencing. First, Tyreek was not a true member of the larger DTO, he did not have a supervisory or leadership role, and certainly did not have any ownership stake in the drug organization. Also, as confirmed by his plea allocution, Mr. Ogarro's involvement in the conspiracy was limited to a three month period, March 2018 to May 2018.

Further, while his Guidelines calculation includes 20 grams of fentanyl, we stress that Mr. Ogarro has never actually bought or sold fentanyl. He has also never possessed fentanyl and certainly is not a fentanyl dealer. The circumstances surrounding the inclusion of fentanyl are that Mr. Ogarro received a phone call from an individual who said that she had $1,000 worth of fentanyl. Tyreek made one phone to see if a friend knew anyone who might want to purchase it. Tyreek does not deny that his motivation was to make some money. However, that single call was Tyreek's only efforts with regard to the fentanyl. Thus, his total involvement ever with respect to fentanyl is two brief telephones calls that never went anywhere.

## II.    ARGUMENT

Tyreek Ogarro stands before the Court prepared to accept its sentence. While he has previously been arrested, this is his first federal case and it has been an eye-opening experience for him. He feels remorse for participating in this offense and we submit that remorse is sincere. The last 19 months have been extremely difficult for Tyreek, who has never spent any significant time in jail.

We respectfully submit that the applicable Guidelines range fails to achieve the objectives of 18 U.S.C. Section 3553(a), and that the Court should impose a non-Guidelines sentence of 36 months, which is "sufficient but not greater than necessary" than to meet the goals of sentencing.

### A.    The Applicable Legal Standard

As the Court is well aware, the Sentencing Guidelines are advisory and while they serve as the starting point for a sentencing court's analysis, the inquiry does not end there. As noted in Nelson v. United States, 129 S. Ct. 890 (2009), where the Court summarily reversed the Fourth

Circuit which had upheld a district court's application of a presumption of reasonableness to the guidelines:

> [t]he Guidelines are not only *not mandatory* on sentencing courts;
> they are also not to be *presumed* reasonable.

*Id*. at 892 (emphasis in original). Thus, the guidelines are now only one factor to be considered in the formulation of a minimally sufficient individualized sentence.

When imposing sentence, the Court is required to consider the factors set forth in 18 U.S.C. § 3553(a)[2] in order to create an "individualized assessment" based on a defendant's particular circumstances. Gall vs. United States, 552 U.S. 38, 49-50 (2007); see also United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The result is that "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." Cavera, 550 F.3d at 188.

The Court has ample discretion to impose a below-Guidelines sentence. See Kimbrough v. United States, 552 U.S. 85, 101-10 (2007). In doing so, the Court may consider, and rely upon, any information available concerning the background, character, or conduct of the defendant. See Cavera, 550 F.3d at 189-91; see also 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an

---

[2] The relevant factors are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed" to, inter alia: provide just punishment, deter criminal conduct, protect the public from any future crimes by the defendant, and provide the defendant with rehabilitative training and treatment; (3) "the kinds of sentences available"; (4) "the kinds of sentence and the sentencing range established" for the offense; (5) "any pertinent policy statement"; (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and (7) "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a).

offense for which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

Moreover, in making an "individualized assessment," the Court is not only empowered to impose a sentence below the Guidelines range, it is required to do so where a lower sentence would be sufficient to comply with the purposes of Section 3553(a). See, e.g., United States v. Dorvee, 616 F.3d 174, 183-84 (2d Cir. 2010); United States v. Ministro-Tapia, 470 F.3d 137, 142 (2d Cir. 2006). This is consistent with the long-standing principle that a Court consider "every convicted person as an individual" and to uphold "the principle that the punishment should fit the offender and not merely the crime." Pepper v. United States, 562 U.S. 476, 487-88 (2011). In sum, the overarching task of a sentencing court is to fashion a sentence that is appropriate for the individual circumstances of the offense and the defendant, and is "sufficient, but not greater than necessary" to achieve the statutory goals of punishment, deterrence, and rehabilitation. 18 U.S.C. § 3553(a).

**B.      Review of the Section 3553(a) Factors Weighs in Favor of a Sentence of 36-months**

While the nature and circumstances of the offense are serious and involve dangerous narcotics, Mr. Ogarro has served a very difficult nearly 20 months in the harsh confines of the maximum security at the MCC. However, Tyreek has made the most of his time studying for his GED and participating in an impressive nearly 30 educational programs offered by the facility. As a result of his actions, Mr. Ogarro has only seen his 7 year old son twice since being incarcerated. This alone has been a motivating factor for him to get his life in order, and we respectfully submit that he has taken considerable steps to reenter society as a productive member.

Mr. Ogarro fully acknowledges and accepts responsibility for his criminal conduct. A sentence of 36 months for the three month period of conduct for which he pleaded guilty is not insignificant and would reflect the seriousness of the offense.

Tyreek grew up in the crime and violence-ridden area of Brooklyn known as Crown Heights. A recent New York Times report highlighted a comprehensive study by the Census Bureau, in collaboration with researchers at Harvard and Brown. See Detailed New National Maps Show How Neighborhoods Shape Children for Life, The New York Times – October 1, 2018, found at https://www.nytimes.com/2018/10/01/upshot/maps-neighborhoods-shape-child-poverty.html (last visited on January 9, 2020). The study "has shown that where children live matters deeply in whether they prosper as adults." Id. According to the research, children that grow up in Mr. Ogarro's neighborhood are expected to earn approximately $27,000 as adults. See https://www.opportunityatlas.org/ (last visited on January 9, 2020). One cannot escape the destiny of their neighborhood if not given the opportunities and resources to do so. While he initially attended high school, Tyreek lacked both the guidance and discipline necessary to help him advance. After attending high school for *five* years, he dropped out still only at the tenth grade level. Mr. Ogarro also recognizes that while he loves his mother greatly, residing with her and her boyfriend is not an ideal situation. He plans to reside with his grandmother and aunt upon release.

As to specific deterrence, a sentence of 36 months, is adequate to serve the goals of specific deterrence. Over the last nearly 20 months, Mr. Ogarro has reflected on both the wrongness of his conduct as well its dangerousness. Notably, while he has been incarcerated, he learned that the brother of the individual Tyreek contacted about the fentanyl passed away from pills that were laced with a fatal drug. This has really opened Tyreek's eyes to the dangerousness

of drugs and the real life consequences. A sentence greater than 36 months is not needed for him

to fully appreciate that the severity of his conduct and we submit that his risk of reoffending is

low.

 Tyreek also has the support and encouragement of family and friends that believe in him

and will guide him upon release. They have also witnessed Tyreek's true remorse. See Exhibit B,

Letter of Richard Brown ("he has spoken wholeheartedly about leading a productive life so that

he can be a better father and role model"); Letter of Jennifer Ogarro ("Tyreek has made mistakes

but is incredibly remorseful and willing to do whatever it takes … and I will continue to help him

the best way I can"); Letter of Jelani Sealey ("Keeping in contact with Tyreek I see the time that

he has faced changed him. Through conversation it seems like for the better.").

 We also respectfully submit that a sentence of 36 months will also provide adequate

general deterrence to the criminal conduct of others, particularly in light of the collateral

consequences of a federal felony conviction. As the Court is aware, felons are ineligible for

federal welfare benefits, public housing and employment opportunities can be extremely limited.

As such, Mr. Ogarro will undoubtedly face obstacles as he seeks to reintegrate himself in the

community and pursue future employment.

 To the extent that the Court has observed that at least some potential offenders are

deterred from committing future crimes by the sentences of others, we respectfully submit that a

sentence of 36 months will produce that effect. The public is now on notice that the Courts may

impose a multi-year jail sentence on those who commit crimes of the sort prosecuted here.

 In addition, the effect of harsh sentences as "general deterrents" is questionable. Social

science appears to undermine the notion that lengthy sentences will deter others from committing

similar crimes. See Amy Baron-Evans, Sentencing by the Statute, pp. 7-9 (April 27, 2009,

revised Dec. 21, 2010) ("…potential criminals … do not believe [that] they will be apprehended and convicted," and therefore, they do not "consider sentence consequences in the manner one might expect of rational decision makers") (citation omitted), a copy of Ms. Baron-Evan's article be found at https://nyn.fd.org/content/sentencing-statute-amy-baron-evans-2009. Because there is no evidence to suggest that sentencing Mr. Ogarro to a more severe punishment will lead to a reduction of crime through general deterrence mechanisms, it is respectfully submitted that the requested sentence is "sufficient, but not greater than necessary" to achieve the statutory goals of deterrence.

Moreover, studies demonstrate that an increased sentence does not result in deterrence. See Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006) (Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."); see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). At some point, the addition of incremental months to Mr. Ogarro's jail sentence no longer promotes the goals of sentencing, and instead become retribution. See United States v. Jenkins, 854 F.3d 181, 192 (2d Cir. 2017) ("Additional months in prison are not simply numbers. Those months have exceptionally severe consequences for the incarcerated individual.").

Finally, 18 U.S.C. § 3553(a)(6) describes "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Here, a sentence of 36 months would be consistent with the sentences imposed in this

case. Two other defendants, Kelly Royster and Robert Rhodes, pleaded guilty to 21 U.S.C. Section 841(c).

Co-defendant Kelly Royster had a guidelines range of 120 – 150 months and a criminal history category of V[3]. He was held responsible for 664 grams of crack (triple the amount of crack attributed to Mr. Ogarro). See ECF # 551 at p. 1, Government's Sentencing Submission for Kelly Royster. The Court sentenced Mr. Royster to a below Guidelines sentence of 78 months.

Co-defendant Robert Rhodes had the same guidelines range as Mr. Ogarro of 70 - 87 months, but he has a higher criminal history of IV. He was held responsible for 155 grams of crack (nearly the same amount of crack cocaine attributed to Mr. Ogarro). See ECF # 395 at p. 1, Government's Sentencing Submission for Robert Rhodes. The Court sentenced Mr. Royster to a below Guidelines sentence of 54 months. We believe that Mr. Ogarro and Mr. Rhodes can be distinguished as Mr. Rhodes had "several prior convictions for possession and sale of drugs and has a recent felony assault conviction involving a firearm." Id. at p. 3.

We respectfully submit that a sentence of 36 months for Mr. Ogarro, who has only one prior conviction, would avoid unwarranted sentence disparities.

As is indicated by the foregoing analysis, the various relevant factors set forth in Title 18 United States Code Section 3553(a) all weigh in favor of a below-Guidelines sentence of 36 months.

---

[3] We note that the defendant contesting this calculation in his sentencing submission, arguing he was a criminal history III, with a resulting Guidelines range of 87 – 108 months. At present time, we are not sure how the Court ruled on this issue.

**<u>CONCLUSION</u>**

For all the foregoing reasons, Tyreek Ogarro respectfully requests that the Court impose a

sentence on him of 36 months and three years' supervised release.

Dated:  New York, New York
        January 15, 2020

                                CARDI & EDGAR, LLP

                                        /s/

                                _____
                                Dawn M. Cardi
                                99 Madison Avenue, 8TH Fl
                                New York, New York 10016
                                212.481.7770 (tel.)
                                212.271.0665 (fax)

                                *Attorneys for defendant Tyreek Ogarro*

# EXHIBIT A

# [REDACTED]

# EXHIBIT B

Richard Brown

████████████

New York, NY 10017

July 19, 2019

To Whom It May Concern:

I have had the pleasure of knowing Tyreek Ogarro for nearly 10 years.  During the years of our acquaintance I have know Tyreek in many capacities.  He is the biological father to my grandson, I████ and he is a good parent to him.  He has an intimate part in his life and loves to interact with I███ in various activities from his schooling to attending church activities that I███ participates in.  I have had many conversations with Tyreek and he has spoken wholeheartedly about leading a productive life so that he can be a better father and role model, and he also confided in me that he wished that he had not made those bad decisions that effected his life to this point.

I trust and believe that if given the opportunity coupled with the right resources that Tyreek will fulfill his desire to become an upstanding law abiding person that society will embrace.  Moreover, Isaiah is so mature beyond his years that I have no doubt that Tyreek will have a more mature and parental outlook to staying the course of being that person that he desires to be.  It is my hope and prayer that Tyreek be given the second chance that he deserves and that if there be any naysayers that he proves them incorrect.

Please do not hesitate to contact me @ (646) ████████ with any other questions.

Best regards,

Richard Brown

Richard Brown

July 18, 2019

To whom it may concern.

my name is D███ B███ cousin of Tyreek Ogarro
who was a great cousin, friend.
He remained these great things his Uncle
was murdered, Tyreek's uncle was my father
and our grandmother moved away after his death.
I was seven years old when my father
Tyreek's uncle passed away now am fourteen.
now am older I understand why tyreek
became depress because he lost a big brother
and a mentor, and he stop coming around.
I didn't really know how to show any
emotion now am fourteen all the pain
is begining to come back, I have more of
a feeling and reaction to the situation
So please am asking you to try and understand
my cousin he's not a bad person. thankyou.

yours sincerely
D███
B███

①

July 28, 2019

RE: Tyreek O'Garro

To Whom it may Concern:

My name is Jennifer O'Garro, mother of Tyreek Ogarro.
I am aware of the events regarding my son
Tyreek Ogarro. I truly believe that Tyreek already.
Suffered extensively for his actions. From the time
he was a little boy, my son has been a kind and
generous soul. He was always quick to help strangers.
Tyreek is a good person with moral character with a good heart
I have seen him experience the good and the bad, as well as
the joys and sorrows in life. Tyreek prison is very hard
on me. I depend on him to help me alot due to my
health condition. I know he's a decent person, he just
needs more people to believe in him so that he can become
the person I know he can be. Tyreek has made mistakes
but he is incredibly remorseful, and is willing to do whatever
it takes to make reparations financially and emotionally
and I will continue to help him the best way I can,
but to do that, he needs you to give him an opportunity
to have a second chance. I realize that Tyreek
broke the law and I do not believe that he should
go without some type of consequence.

I just hope you will recognize the power you yeild
with regard to the future of this gentleman
and make a fair decision.


Thank you for your time and cooperation.


Sincerely
Jennifer Ogarro
3.

To whom it may concern,

Tyreek O'garro is my older cousin and has been a pivotal person in my life. As my older cousin Tyreek helped guide me when I was younger. When growing up Tyreek would help me with homework, make breakfast, all the things an effective role should do. As a recent graduate from college I could safely say Tyreek's influence in my childhood and early teens was pivotal for my development and is one of the driving forces in who I am today. Tyreek is a good person and the issues he is having now are only apparent after or uncle Duane passed away. Our uncle Duane passed away January 13th, one day before Tyreek's birthday. Just like any regular family this was truly heartbreaking for us, especially since our uncle was such a positive force in our life. Once this happened there was a change in Tyreek, but I know that my cousin I grew up is still there.

Sincerely, Maziyah O'garro

6/28/19

7/23/2019

Christian Ambulette Inc. Mail - (no subject)



Titus Aldea <admin@christianambulette.com>

## (no subject)
1 message

**Jelani Sealey** <j23sealey@yahoo.com>
Reply-To: @yahoo.com" < @yahoo.com>
To: "admin@ .com" <admin@ .com>

Mon, Jul 22, 2019 at 9:50 PM

To whom it may concern,

I Jelani Sealey just wanted to take the time to talk to you about my God brother Tyreek Ogarro who is currently incarcerated and what I see in him as a person. Growing up Tyreek was the closest thing I had as a brother. I feel like I know him better then he know himself sometime. Though he is incarcerated I never seen Tyreek to be considered as a bad person. The people I know that know Tyreek always appreciated the energy he brought to the atmosphere. He was always help and put other before himself. If he could help he would and if he could he did. I can truly say he is missed out on the outside. Especially his mother who he help takes care of. I check on her from time to time just because I know the time Tyreek has spent incarcerated is a stress added to the stress of her medical health. Keeping in contact with Tyreek I see the time that he has faced has changed him. Through conversation it seem like for the better. He speaks alot about how much he misses his son and all the plans he has for them so their relationship can continue to grown. He was to be seen as a positive role model in the life of his son and his younger siblings who look up to him. We speak about all the good we wanna do as he comes home. I work with the Department Of Education as a paraprofessional. I see alot of children who struggle with being a product of their environment and lack guidance due to conflicts of their living conditions. Tyreek told me if he had the opportunity to be released if it was possible he wanted to take the timeout to speak to some of my children at the school I work at or even converse with my former students about his life experiences. I believe everyone should be giving the opportunity to turn over a new leaf in life and get a fresh start. The mistakes that you make don't always shape your character. Just waiting for the time when my brother is released to I can assist him on his journey of turning over a new leaf.

Sincerely

Jelani Sealey

Sent from Yahoo Mail on Android

Sent from Yahoo Mail on Android