

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

January 28, 2020

**BY ECF**

The Honorable Richard J. Sullivan
United States Circuit Judge for the Second Circuit
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

  Re: *United States* **v.** *Tyreek Ogarro, a/k/a "Reek,"* S1 18 Cr. 373 (RJS)

Dear Judge Sullivan:

  The Government submits this letter in advance of the February 4, 2020 sentencing of Tyreek Ogarro, a/k/a "Reek" (the "defendant") and in response to the defendant's sentencing submission ("Def.'s Mem."). As explained below, the Government respectfully submits that a sentence within the applicable United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range should be imposed in this case.

  **I.** **Offense Conduct**

  The defendant sold narcotics with members of a drug crew, known as the "Boss Crew" (the "Crew"), which distributed heroin and crack cocaine primarily in the Bedford Stuyvesant neighborhood of Brooklyn. *See* United States Probation Office's Presentence Investigation Report ("PSR") ¶¶ 11-12. From at least in or about March 2018 up until his arrest in June 2018, the defendant participated in the Crew by, among other things, facilitating the sale of a wholesale quantity of crack with the Boss Crew leader, Tyshawn Burgess, and attempting to obtain a firearm from another member of the conspiracy, Ernest Murphy. *See id.* ¶¶ 11-12, 24-26. During the course of the offense, the defendant was responsible for conspiring to distribute approximately 157 grams of crack and 20 grams of fentanyl. *See id.* ¶ 28.

  In addition to the defendant, the Crew consisted of the following members and associates charged in the Indictment: Tyshawn Burgess, Lloyd Gordon, Larry Bayer, Tyquan Robinson, Devontae Newton, Tyrell Sumpter, Maurice Curtis, Tyreek Ogarro, Darren Miller, Ernest Murphy, Ramal Curtis, Kerry Felix, Robert Rhodes, and Kaemar Wilson. *Id.* ¶ 11. The Crew operated out of multiple stash locations, including the apartment of a drug user referred to by the Crew as "Auntie," who resided at 94 Ralph Avenue ("Auntie's Crib"). *Id*. ¶ 14. At Auntie's Crib, the Crew stashed its supply of crack and heroin, cooked cocaine into crack, and packaged crack for street distribution. *Id*. ¶ 16. Additionally, for a period of time, Crew member Ernest Murphy maintained a stash house of drugs and at least one firearm, located at 672 Decatur Street, from which drugs were sold. *Id*. ¶ 20.

January 28, 2020
Page 2

Beginning around August 2017, law enforcement infiltrated the Crew's narcotics distribution network with the use of a confidential source ("CS") and subsequently with an NYPD undercover officer (the "UC"), who individually and together made over 40 controlled crack purchases from members and associates of the Crew yielding over 50 grams of crack from approximately August 2017 through March 2018.  *Id.* ¶ 17. The sales would take place on the street in the vicinity of Auntie's Crib—located at 94 Ralph Avenue between Jefferson and Putman Avenues—or at a nearby restaurant on Ralph Avenue, involving multiple members of the Crew.

During the course of the investigation, until the time of the defendants' arrests, eight phones—including the defendant's phone and phones belonging to Tyshawn Burgess, Lloyd Gordon, Larry Bayer, and Tyrell Sumpter—were intercepted pursuant to judicially authorized wiretap orders under Chapter 119 of Title 18 of the United States Code.  Thousands of intercepted wire calls detail the Crew's drug operation, their sources of supply, customers, stash, distribution network, and possession and use of firearms in furtherance of their drug dealing.  *Id.* ¶ 18.

**I.   The Defendant's Drug Dealing**

In particular, several recorded conversations were intercepted between the defendant and other individuals, including co-conspirators in this case, that concern narcotics dealing.  For example, on or about March 31, 2018, the defendant brokered the distribution of a wholesale quantity of crack cocaine with Tyshawn Burgess and had the following phone conversation with Burgess, in substance and in part:

**BURGESS:**   What's popping?

**OGARRO:**   [ASIDE: [U/I] come for three (3) real quick.] Yo [STUTTERS] I'm trying to hit you, you know I don't be trying to talk, I don't be trying to talk on this shit, yo umm [U/I] right [U/I] just asked for you umm [STUTTERS] remember the Billy from [U/I].

**BURGESS:**   Yeah, yeah.

**OGARRO:**   Yeah, he said he need thirty (30).

**BURGESS:**   Thirty (30) yams?

**OGARRO:**   Hell yeah!

**BURGESS:**   I could get that nigga too. I'm waiting for him to write me back. That nigga hit me on Facebook.

**OGARRO:**   Nigga said thirty (30). I been trying call you all day nigga. [LAUGHS]

January 28, 2020
Page 3

> **BURGESS:** Damn! I was downtown mad shit going on, word I left my phone at the crib I went to downtown and just got back.
>
> **OGARRO:** Nah, hell yeah. [STUTTERS] mad shit going on right now, I was just trying to put you on to that lick. That nigga trying to stay out here. That nigga he was like, "Yo, umm let him know." 'Cause he'll pull up.
>
> **BURGESS:** Aight, I'm about to hit the nigga. He just wrote me on Facebook like yo answer your phone. I ain't know [STUTTERS] I thought that, I thought [U/I] you so I wasn't answering back [VOICES OVERLAP].
>
> **OGARRO:** Nah [STUTTERS] he probably he probably think I forgot.

During this conversation, the defendant requests a quantity of crack cocaine from Burgess for a drug customer ("*Billy*") who the defendant has identified as a potential sale for Burgess ("*I was just trying to put you on to that lick*"). The defendant specifies on the call that the customer is asking for approximately thirty grams of crack cocaine, ("*Yeah, he said he need thirty*"), and Burgess confirms that he can provide those narcotics, ("*I could get that nigga too. . . . I'm about to hit the nigga.*").

The defendant further discussed with other individuals during intercepted conversations the sale of crack cocaine and referenced working with other members of the conspiracy. On or about May 11, 2018, the defendant exchanged a series of text messages with an unidentified male ("Male-1"), in substance and in part:

> **MALE-1:** Charlie just called me all the way to the pz for 1 football
>
> **OGARRO:** Deadass
>
> **OGARRO:** Y he not pickin up
>
> **MALE-1:** he out here
>
> **OGARRO:** I.know. He owe me 25 I want my cash

In this call, Male-1 advises the defendant that "Charlie"—a reference to co-conspirator Robert Rhodes—is coming to the housing projects ("*pz*") where the defendant is known to engage in drug dealing, to obtain an eight ball of crack ("*1 football*"). The defendant then tells Male-1 that "He owe me 25 I want my cash," referring to the fact that Rhodes, *i.e.*, "Charlie," owes the defendant money from a prior narcotics sale.

The defendant also facilitated the distribution of marijuana, pills, and fentanyl. On or about May 11, 2018, for example, the defendant discussed with other members of the Boss Crew during intercepted communications that the defendant would be going to a particular area—Ralph Avenue

January 28, 2020
Page 4

in Brooklyn, New York—near where Auntie's Crib was located and the Boss Crew primarily sold its narcotics.

| | | |
|---|---|---|
| **MURPHY:** | | Ain't shit, we rocking. What you fucking with? |
| **OGARRO:** | | Shit I'm in the crib right now, waiting for my P.O. to pull up. |
| **MURPHY:** | | Ah, I meant to call you earlier when I rode past your brib rill. |
| **OGARRO:** | | A'ight. I'm just waiting for this nigga to come, he gotta drive by, see I'm here, then he can dip, I'm going outside. |
| **MURPHY:** | | A'ight bet. Holla at me later on or something and see what I'm fuckin with-Imma be in the hood. |
| **OGARRO:** | | A'ight bet. Hell yeah, Imma-Imma call you as soon as I get to Ralph. |
| **MURPHY:** | | Three R. Alright bet, I'm on my way up. I'm about to pass Cee's [PH] right now, so I see when you out here. |

In this call, the defendant discusses meeting with Ernest Murphy, another co-conspirator in this case, at a location where the Boss Crew operates and sells narcotics, ("*Imma-Imma call you as soon as I get to Ralph*"), and Murphy confirms that he will meet the defendant at that location ( "*Three R. Alright bet, I'm on my way up. I'm about to pass Cee's* [PH] *right now, so I see when you out here*"). On the same date, a few hours later, the defendant informs Murphy that he is about to sell marijuana to make some money, ("*I'm about to go to the hood right now my friend just copped a little weed so I'm about to see what he's doin'. . . . I'm about to just go to the hood. Try and get some bread for the moms, so I can get my moms a little Firestick [PH] or some shit.*"), and Murphy responds that he also is going to make sales and will connect with the defendant later, ("*Yeah I'm trying to get to run around too so Imma definitely hit you Imma catch you later on.*").

The defendant's intercepted narcotics-related conversations also included communications with other individuals about selling a significant quantity of fentanyl. On or about May 8, 2018, for example, the defendant called an unidentified male ("Male-2"). In this conversation, among other things, the defendant advises Male-2 that he has a female supplier with a quantity of fentanyl that is worth approximately one thousand dollars ("*She got a thousand dollars worth of fentanyl*") and Male-2 responds, in substance and in part, that fentanyl is too strong of a substance for him to sell ("*Nah, I ain't dealing with that. It's killing people*"). The defendant then asks Male-2 to connect him with other potential customers for the drug ("*[J]ust put the word out. Let the niggas know that I am on the block*") and Male-2 agrees to do so.

In a subsequently recorded conversation, the defendant spoke with the supplier of this fentanyl ("Female-1") and informed Female-1 that he was still trying to find someone who would purchase the narcotics (FEMALE-1: "*Yo you ain't find nobody who wants this shit?*" OGARRO: "*Hell no these niggas actin like they scared of that shit*" FEMALE-1: "*What is it called cause I*

January 28, 2020
Page 5

*can't pronounce it right?*" OGARRO: "*Fe-fe- Fentanyl. Fentanyl*."). The defendant further informed Female-1, in substance and in part, that although he had not been successful to date, he was still attempting to find another customer for the fentanyl. (OGARRO: "*I gotta speak to my last option. I gotta see.*").[1]

Finally, the defendant also engaged in intercepted conversations about possessing drug paraphernalia that could be used for packaging and distributing narcotics. On or about May 17, 2018, for example, the defendant called an unidentified female ("Female-2") and asked Female-2 to "wrap [his] scale in a shirt and toss it out the window" because the defendant was going to be passing by the window at the time.

### II. The Defendant's Access to and Use of Firearms

The defendant discussed not only the distribution of narcotics during his intercepted communications, but also using and accessing firearms. For example, on or about May 11, 2018, the defendant and Ernest Murphy had the following conversation in which Murphy stated, in substance and in part, that he intended to carry a firearm with him:

| | |
|---|---|
| **MURPHY:** | I know the nigga Joe Joe [PH] a dub too. Yeah Black mom try to tell me that the niggas wanted the GTO to cave me in, take the cave from Waz [PH]. I told Waz [PH] shit got crazy. |
| **OGARRO:** | Oh shh-yeah I thought-you definitely got to pull over there [UI] right there. |
| **MURPHY:** | Yeah I think niggas going be moving funny after I twin tower too so I don't know. [UI] bringing that duffle with me cause I ain't gonna lie I don't like niggas moving. Niggas trying to make it lie I'm lying they talking about I was drunk all this other shit like I don't know what you said nigga. |
| **OGARRO:** | Oh nah niggas-ah man he definitely yeah-we goin link up we gotta link up. |
| **MURPHY:** | Yeah we gon chop it |

In this conversation, Murphy informs the defendant that Murphy intends to carry around a firearm ("*duffle*") because he is worried about other individuals in his neighborhood, ("*Yeah I think niggas going be moving funny after I twin tower too so I don't know. [UI] bringing that duffle with me cause I ain't gonna lie I don't like niggas moving. Niggas trying to make it like I'm lying.*"). The defendant, in turn, confirmed that he would serve as reinforcement for Murphy if needed

---

[1] The Government has not identified any intercepted phone conversations in which the defendant later discusses selling the fentanyl.

January 28, 2020
Page 6

(OGARRO: "*Oh nah niggas-ah man he definitely yeah-we goin link up we gotta link up.*" MURPHY: "*Yeah we gon chop it.*").

In the weeks prior to his arrest, the defendant also had numerous communications in which he sought firearms and ammunition, including from co-conspirators in this case. For example, on or about May 17, 2018, the defendant again called Ernest Murphy. The defendant asked Murphy if he is "still in the hood tryin' to do this switcharu" and if Murphy "knows anyone who wants to trade for [the defendant's] shaq jersey." In this conversation, therefore, the defendant inquires if Murphy wants to trade firearms with the defendant ("*switcharu*") and if Murphy knows of anyone who would trade guns with the defendant ("*trade for this shaq jersey*").

The following day, on or about May 18, 2018, the defendant continued to search for someone who would either provide him with a new firearm or with ammunition for the firearm that he already possessed. In particular, the defendant exchanged text messages with an unidentified individual ("UI"), during which the defendant sought .32 caliber bullets for a firearm ("*Pls tell me y'all got 32 shells pls. If u find some let me know I need em bad.*").

The next day, on or about May 19, 2018, the defendant called another individual ("Male-3") and had the following conversation, in substance and in part:

| | |
|---|---|
| **OGARRO:** | Yo I'm tryin to see if he can give me something for um |
| **MALE-3:** | Yea I couldn't find. For what the Shaq? Clearly I know give it to you. |
| **OGARRO:** | Damn that's all I got |
| **MALE-3:** | Waitin I'm waitin right now. I need tha tha tha tha tha um that quarter that quarter that quarter round two know what I'm sayin. |
| **OGARRO:** | I know niggas don't wanna do a trade I'm sayin that's all I got. I only got I only got the Shaq. |
| **MALE-3:** | Somebody got the quarter for sale. |
| **OGARRO:** | What number he gonna put on it. |
| **MALE-3:** | Um, like four, four fifty. |
| **OGARRO:** | Aight bet so imma imma hit one of the H to see what these niggas talkin bout. |
| **MALE-3:** | Aight |
| **OGARRO:** | If you find that shit please hit me boy I ain't got shit. |

    **MALE-3:**    I got you.

  In this conversation, the defendant and Male-3 discuss a deal for a firearm. Specifically, Male-3 informs the defendant that he knows about a .25 caliber firearm for sale ("*Somebody got the quarter for sale*") and the defendant indicates that he would be willing to purchase that firearm ("*If you find that shit please hit me boy I ain't got shit*.").

  On or about May 29, 2018, the defendant again discussed with Murphy during an intercepted phone communication whether Murphy could find someone who would trade the defendant for his firearm. The defendant and Murphy had the following conversation, in substance and in part:

    **OGARRO:**  [Laughs] // In and out that shit, test me niggas I'm outta here man. Fuck it, I might come… Imma be in the P's [PH] in probably, like the next two hours. This little nigga owes me thirty-one dollars, shit ain't nothing, it's a principle, he keep swearin on his fuckin-swearing on the debt so. I'm just gonna break this little nigga body up real quick. Yo – nobody's got no duffle, nobody's trying to trade no duffle, right?

    **MURPHY:**  Nah, you asked me that already.

    **OGARRO:**  That thirty-two bro, I can't-I don't got nothin-I can't I don't got nothin for that shit. I'm afraid they just-just call my shit, bro.

    **MURPHY:**  Say no more. Imma try, I'm in the Hood-I'm just-Imma have them make a run right quick.

    **OGARRO:**  Aight bet you. Well, if anybody got some shit just hit me, I'll buy them shits from them bro.

    **MURPHY:**  Aight, Imma put the word, I'll probably get something to O.G. [PH]

  On this call, the defendant again asks Murphy if he has found someone who will trade him a firearm ("*Yo – nobody's got no duffle, nobody's trying to trade no duffle, right?*") and explains that he needs a new firearm because he has no bullets to put in his .32 caliber firearm ("*That thirty-two bro, I can't-I don't got nothing-I can't I don't got nothing for that shit*").

  The defendant further tells Murphy, in substance and in part, that he needs the firearm because someone owes him some money, ("*This little nigga owes me thirty-one dollars, shit ain't nothing, it's a principle, he keep swearin on his—swearin on the debt so. I'm just gonna break this little nigga body up real quick.*"), and the defendant is worried about confronting the individual if the defendant's .32 caliber firearm does not have any ammunition, ("*I can't I don't got nothing for that shit. I'm afraid they just-just call my shit, bro*."). In response, Murphy confirms that he will try to find the defendant someone who is willing to trade firearms ("*Say no more. Imma try, I'm in the Hood-I'm just-Imma have them make a run right quick*.").

January 28, 2020
Page 8

## II. The Defendant's Plea and Applicable Guidelines Ranges

On or about May 14, 2019, the defendant pled guilty pursuant to a plea agreement to conspiring to distribute and possess with the intent to distribute cocaine base, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(C). *Id.* ¶ 6. In the plea agreement, the parties calculated that the defendant had an offense level of 25 and four criminal history points, placing him in Criminal History Category III and resulting in a stipulated Guidelines range of 70 to 87 months' imprisonment. *Id.* ¶ 7.

The Probation Office agrees with this calculation in its Pre-Sentence Investigation Report and recommends a below-Guidelines variance of 60 months' imprisonment. *Id.* at 25. Defense counsel argues for a variance of 36 months. *See Def. Mem.* at 2.

## III. Discussion

### A. Applicable Law

Although *United States* v. *Booker*, 543 U.S. 220, 264 (2005), held that the Guidelines are no longer mandatory, it also held that district courts must "consult" the Guidelines and "take them into account" when sentencing. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After performing that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the four legitimate purposes of sentencing, as set forth below, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statement by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. Analysis

The Government respectfully submits that a sentence of imprisonment within the applicable Guidelines range is appropriate based on all of the sentencing factors set forth above—including the defendant's role in the charged conspiracy—and that such a sentence would be sufficient but not greater than necessary to accomplish the goals of sentencing in this case. *See* 18 U.S.C. § 3553(a).

*First,* the nature and circumstances of the defendant's offense conduct weigh heavily in favor of a within-Guidelines term of incarceration. As set forth above, the defendant was engaged in drug dealing and weapons possession during the course of the charged conspiracy.

While the defendant participated in the Boss Crew, the Crew sold approximately 157 grams of crack cocaine in the streets of a residential Brooklyn neighborhood. During this period, the defendant had direct communications with the leader of the Boss Crew, Tyshawn Burgess. In particular, and as noted above, in March 2018, the defendant informed Burgess that an individual wanted to purchase 30 grams of crack cocaine and helped coordinate that sale. By the end of March 2018, therefore, the defendant had established his connection with Burgess as a wholesale supplier of narcotics and the defendant was already known by other individuals as someone who had access to large quantities of drugs.

The defendant also sold or attempted to sell pills, marijuana, and fentanyl during the period in which he was working with the Boss Crew. As described above, the defendant discussed with Murphy about meeting him in the location where the Boss Crew operated and, in a separate conversation a few hours later, the defendant further informed Murphy that he would be selling marijuana in order to make some money. The defendant also had several phone calls in which he discussed that Female-1 had a large quantity of fentanyl and made attempts to find customers for that fentanyl. Even after one individual refused to directly sell the fentanyl for the defendant because of the potency of the drug, the defendant persisted and asked that individual to "put the word out for" the defendant and try to find other customers.

In addition to the defendant's conduct associated with the distribution of narcotics, the defendant also discussed possessing firearms and using violence. In particular, on or about May 11, 2018, Ernest Murphy informed the defendant that he intended to bring a firearm when he met with certain individuals because they posed a threat to Murphy. In response, Murphy assured the defendant that he would "link" with—or help—Murphy.

Further, for a period of time shortly before his arrest, the defendant made persistent attempts to obtain ammunition for his gun or to trade his gun for a different firearm. The defendant explained to Murphy that he wanted to "break . . . [the] body" of someone who owed him thirty-one dollars. The defendant acknowledged that it was not a large debt but that violence was necessary because of the "principle"—that he had not been repaid. The defendant further discussed with Murphy that he wanted to make sure that he had ammunition when he went to reclaim his debt because he was scared the individual might call his bluff if the defendant did not have a loaded firearm. The defendant, thus, did not just merely possess a firearm. He intended to

exact violence against someone who owed him a small debt and he sought out a loaded gun in case he needed to use it to reclaim that debt.

In light of the seriousness of the offense, therefore, a Guidelines sentence is appropriate.

*Second,* a Guidelines sentence is also appropriate in order to achieve just punishment. The defendant's drug dealing and involvement in the Crew was damaging and dangerous to the public. While the defendant was not personally involved in carrying out violence on behalf of the Crew, the violence the Crew committed was a direct result of the extensive drug operation in which the defendant was a participant.

As discussed above, the defendant also was clearly aware that other members of the Crew had access to weapons, he indicated that he would help provide protection to them, and he actively sought a loaded firearm in order to exact his own punishment against an individual who owed him a small amount of money. A Guidelines sentence is therefore warranted to achieve just punishment for the defendant's crime.

*Third,* the defendant's relevant criminal history reflects a serious disregard for the law and a significant sentence is necessary to ensure that the defendant is deterred from committing additional offenses.

On or about March 22, 2017, the defendant was convicted of criminal possession of a weapon in the third degree, and was sentenced to six months' imprisonment and a term of five years' probation. The defendant, therefore, engaged in the instant offense while he was on state probation.

The defendant, in fact, discusses on one of the intercepted calls that he is waiting for his probation officer ("*P.O.*") to arrive so that the defendant can leave and meet with his friend who has marijuana to make some money ("*bread*"). The defendant, therefore, intended to continue to engage in criminal conduct even immediately after his meeting with his probation officer, who presumably was confirming with the defendant that he was abiding by the conditions of his supervision, including that he not commit any new crimes.

The defendant's disregard for the law is not just limited to his continued narcotics sales while on supervision. After being convicted of the weapons possession offense, and while serving his term of probation, he went on to possess another firearm and to discuss using that firearm in acts of violence. And, as described above, the defendant contemplated using violence against an individual who owed him *thirty-one dollars*. The defendant himself admitted on the call that it was a disagreement about a small amount of money but that it was the "principle of the thing."

The defendant's own words—that he will resort to violence to exact small debts—is powerful evidence that he was not deterred from his prior firearms conviction and must be given a significant sentence in this case to ensure that he does not take any further steps to engage in violence.

January 28, 2020
Page 11

**IV.     Conclusion**

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence of imprisonment within the applicable Guidelines range.

> Respectfully submitted,
>
> GEOFFREY S. BERMAN
> United States Attorney for the
> Southern District of New York
>
> By: _____
> Elinor L. Tarlow / Matthew J.C. Hellman /
> Karin Portlock
> Assistant United States Attorneys
> (212) 637-1036 / -2278 / -1589

cc:     Dawn M. Cardi, *counsel for the defendant* (by E-mail and ECF)