

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 7, 2020

**BY ECF and EMAIL**

The Honorable Richard J. Sullivan
United States Circuit Judge for the Second Circuit
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

  Re: *United States v. Tyreek Ogarro*, S1 18 Cr. 373 (RJS)

Dear Judge Sullivan:

  The Government submits this letter in response to defendant Tyreek Ogarro's motion for temporary release pursuant to 18 U.S.C. § 3582(c)(1)(A). For the reasons set forth below, the defendant's request should be denied. First, the defendant has failed to exhaust his administrative remedies. Second, the Court does not have the authority to grant temporary release pursuant to Section 3582(c). Third, even if it did, such relief would not be warranted. Although the defendant argues that he has asthma, he does not provide any medical records to corroborate this diagnosis, describe the severity of his asthma, or explain how his release would lessen the risk posed to him by COVID-19. Further, because the defendant committed a serious offense and has served less than half of his below-Guidelines sentence, he has not demonstrated an "extraordinary and compelling reason" that warrants granting temporary release.

**I. Background**

  The defendant sold narcotics with members of a drug crew (the "Boss Crew"), which distributed heroin and crack cocaine primarily in the Bedford Stuyvesant neighborhood of Brooklyn. From at least March 2018 up until his arrest in June 2018, the defendant participated in the Boss Crew by, among other things, facilitating the sale of a wholesale quantity of crack with the Boss Crew leader, Tyshawn Burgess, and attempting to obtain a firearm from another member of the conspiracy, Ernest Murphy. During the course of the offense, the defendant was responsible for conspiring to distribute approximately 157 grams of crack and 20 grams of fentanyl.

  In particular, during the course of its investigation, the Government intercepted recorded conversations in which the defendant discusses the sale of crack cocaine, marijuana, pills, and fentanyl and the packaging and distribution of narcotics. The defendant also discusses during his intercepted communications using violence against rival gangs and accessing weapons. In the weeks prior to his arrest, for example, the defendant tried to ensure that he had a loaded firearm,

by tracking down ammunition for a particular gun that he possessed and asking others for a new gun to match the ammunition that he already had obtained.

On May 14, 2019, the defendant pled guilty pursuant to a plea agreement to conspiring to distribute and possess with the intent to distribute cocaine base, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(C).  In the plea agreement, the parties calculated that the defendant had a stipulated Guidelines range of 70 to 87 months' imprisonment.

On February 4, 2020, the Court sentenced the defendant to a below-Guidelines sentence of 50 months' imprisonment to be followed by 3 years' supervised release.  The defendant, who has been in custody since his June 2018 arrest, has served approximately 22 months—or slightly less than half—of his sentence.

On April 3, 2020, the defendant filed the instant motion, arguing that the recent spread of COVID-19 poses a serious health risk to him because he is asthmatic.  The defendant requests that, in light of that risk, he be temporarily placed on home confinement until the COVID-19 pandemic has been deemed no longer a health crisis, at which point the defendant would return to BOP to serve the remainder of his sentence.

## II.  Applicable Law

Under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act, the Court "may not modify a term of imprisonment once it has been imposed except" as provided by statute.  As relevant here:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

*Id.*  The policy statement, which appears at Section 1B1.13 of the Guidelines, provides that a reduction of sentence is permitted if: "extraordinary and compelling reasons warrant the reduction," U.S.S.G. § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and "the reduction is consistent with this policy statement," *id.* § 1B1.13(3).  The Application Notes of

§ 1B1.13, in turn, describe multiple ways that a defendant can show an "extraordinary and compelling reason," but only one is relevant here:

> (A) Medical Condition of the Defendant.—
>
> > (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> >
> > (ii) The defendant is—
> >
> > > (I) suffering from a serious physical or medical condition,
> > >
> > > (II) suffering from a serious functional or cognitive impairment, or
> > >
> > > (III) experiencing deteriorating physical or mental health because of the aging process,
> >
> > that substantially diminishes the ability of the defendant to provide selfcare within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, Application Note 1.

As the proponent of the motion, the defendant bears the burden of proving "extraordinary and compelling reasons" exist under the above criteria to justify early release. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.").

### III. Discussion

#### A. The Defendant Has Not Exhausted His Administrative Remedies

For the reasons set forth below, the defendant's motion should be denied. First, 18 U.S.C. § 3582(c)(1)(A) *conditions* the possibility of a sentence modification on (i) a motion to the Court from the BOP or (ii) defendant's exhaustion of all administrative appeals from the BOP's refusal to bring a motion on his behalf or the lapse of 30 days after such a request by the defendant to the BOP. The defendant concedes that his motion before this Court has not complied with these procedural requirements and that he has failed to exhaust his administrative remedies. Because such exhaustion is mandatory, the Court lacks the authority to grant compassionate release at this time.

As described above, under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. One such circumstance is the

so-called compassionate release provision, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling circumstances." *Id.* § 3582(c)(1)(A)(i). A motion under this provision may be made by either the Bureau of Prisons or a defendant, but in the latter case only "after the defendant has *fully exhausted all administrative rights* to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* (emphasis added). Thus, where a compassionate release motion is brought by a defendant who has not "fully exhausted all administrative rights," the district court "may not" modify his term of imprisonment.

Section 3582(c)(1)(A)'s exhaustion requirement is therefore mandatory. It is critical, in this context, to note that Section 3582(c)'s exhaustion requirement is statutory, and thus is not the sort of judicially-crafted exhaustion requirement that "remain[s] amenable to judge-made exceptions." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016). By significant contrast, *statutory* exhaustion requirements "stand[] on a different footing." *Id.* There, "Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to." *Id.* Thus, where a statute contains mandatory exhaustion language, the only permissible exceptions are those contained in the statute. *Id.*; *see also Bastek v. Fed. Crop. Ins.*, 145 F.3d 90, 94 (2d Cir. 1998) ("Faced with unambiguous statutory language requiring exhaustion of administrative remedies, we are not free to rewrite the statutory text.").

As described above, Section 3582(c)(1)(A) contains mandatory exhaustion language with no statutory exceptions. The plain language of the statute makes clear that a court "may not" modify a sentence unless, as relevant here, the defendant has first "fully exhausted all administrative rights" or waited 30 days after transmitting his request to the warden. Unlike the Prison Litigation Reform Act, for example, there is no statutory qualifier that a defendant need only exhaust all "available" remedies. [1] Thus, Section 3582(c)(1)(A) is a mandatory exhaustion provision with no applicable exceptions. *Cf. Fry v. Napoleon Community Schools*, 137 S. Ct. 743, 750 (2017) (statute requiring that certain types of claims "shall be exhausted" is a mandatory exhaustion provision for those types of claims). For this reason, as Judge Cote has explained, this court lacks the authority to grant the defendant's motion at this time. *United States v. Monzon*, 2020 WL 550220, at *2 (S.D.N.Y. Feb. 4, 2020).

In recent weeks, numerous defendants around the country have cited the unusual circumstances presented by COVID-19 as a basis for compassionate release, and have argued that the exhaustion requirement should be excused. The only court of appeals to have addressed the question has rejected the argument and required exhaustion. *See United States v. Raia*, __ F.3d __, 2020 WL 1647922, at * (3d Cir. Apr. 2, 2020). In *Raia*, the Third Circuit recognized the serious concerns presented by COVID-19, but held that, in light of these concerns, as well as the BOP's

---

[1] In particular, the PLRA demands that an inmate exhaust "such administrative remedies *as are available*," meaning that the only permissible exception to exhaustion is where the remedies are "unavailable." *Ross*, 136 S. Ct. at 1856-58 (emphasis added); *see also id.* at 1855 (criticizing the "freewheeling approach" adopted by some courts of appeals to exhaustion requirements, and overruling precedent from the Second Circuit and other circuits that had read additional exceptions into the rule). Here, no such exception exists in the statute.

statutory role and its "extensive and professional efforts to curtail the virus's spread, . . . strict compliance with Section 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Id.* at *2. The vast majority of district courts have also required exhaustion despite COVID-19 claims.[2] These decisions are consistent with the plain language of Section 3582(c).

To be sure, COVID-19 presents unusual circumstances, in which compassionate release decisions should be made expeditiously. But the text of Section 3582 contains no exigency exception for such circumstances, and indeed the text affirmatively refutes the availability of such an exception in two respects. First, while many statutory exhaustion provisions require exhaustion of all administrative remedies before a claim is brought in court, Section 3582 provides an alternative: exhaustion of all administrative rights *or* the lapse of 30 days from the warden's receipt of the inmate's request for compassionate release, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A). This alternative suggests that the Congress recognized that even if compassionate release requests cannot always await the full administrative process to be completed, the BOP should have at least 30 days to act on such a request. Second, in cases presenting the most urgent circumstance – inmates diagnosed with a terminal illness – Section 3582(d) requires the BOP to process any application for compassionate release in 14 days. That the Congress allowed 14 days to process the claims of even a terminally ill inmate suggests that it could not have intended to allow a shorter period – which excusing exhaustion would provide – in a case, such as this, where the risk to the inmate, while serious, remains potential.

As the Third Circuit properly recognized, the mandatory exhaustion requirement accommodates the valuable role that the BOP plays in the compassionate release process. Informed decisions about compassionate release require the collection of information, like disciplinary records and medical history, that the BOP is uniquely suited to obtain and which will benefit both the BOP and later the court evaluating such claims. The BOP is also well situated to make relative judgments about the merits of compassionate release petitions—particularly at a time like this when many inmates are making petitions advancing similar claims—and adjudicate those positions in a consistent manner. The court may of course review those judgments, but the Congress expressed its clear intent that such review would come second, with the benefit of the BOP's initial assessment.

---

[2] *See United States v. Hernandez*, No. 18 Cr. 834 (PAE), 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020); *United States v. Cohen*, No. 18 Cr. 602 (WHP), 2020 WL 1428778, at *1 (S.D.N.Y. Mar. 24, 2020); *United States v. Carver*, No. 19 Cr. 6044, 2020 WL 1604968, at *1 (E.D. Wa. Apr. 1, 2020); *United States v. Clark,* No. 17 Cr. 85 (SDD), 2020 WL 1557397, at *3 (M.D. La. Apr. 1, 2020); *United States v. Williams*, No. 15 Cr. 646, 2020 WL 1506222, at *1 (D. Md. Mar. 30, 2020); *United States v. Garza*, No. 18 Cr. 1745, 2020 WL 1485782, at *1 (S.D. Cal. Mar. 27, 2020); *United States v. Zywotko*, No. 19 Cr. 113, 2020 WL 1492900, at *1 (M.D. Fla. Mar. 27, 2020); *United States v. Eberhart,* No. 13 Cr. 313 (PJH), 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020); *United States v. Gileno*, No. 19 Cr. 161, 2020 WL 1307108, *3 (D. Conn. Mar. 19, 2020). *But see United States v. Perez*, No. 17 Cr. 513 (AT), 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020); *United States v. Colvin*, No. 19 Cr. 179 (JBA), 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020). Both *Perez* and *Colvin* relied on *Washington v. Barr*, 925 F.3d 109 (2d Cir. 2019), which as discussed further below, is inapposite because it involves judge-made exhaustion doctrine.

To ignore this mandatory exhaustion requirement would be legal error.

The defendant cites to *United States v. Perez*, 17 Cr. 513-3 (AT), 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020), in support of his argument that a court may find the exhaustion requirement does not apply. In *United States v. Perez*, Judge Torres concluded that she had the discretion, under certain circumstances, to waive the exhaustion requirement in light of a Second Circuit case—*Washington v. Barr*, 925 F.3d 109 (2d Cir. 2019). But the holding of *Washington v. Barr* does not apply when, as here, a motion has been filed under Section 3582(c). *Washington v. Barr* involved the invocation of a *judge-made* exhaustion doctrine. *See id.* at 116 (stating that the statute in question "does not mandate exhaustion of administrative remedies" but finding that exhaustion requirement was nevertheless appropriate); *id.* at 118 ("Although not mandated by Congress, [exhaustion] is consistent with congressional intent."). Thus, it was appropriate for the court to consider judge-made exceptions. *See Ross*, 136 S. Ct. at 1857. But this case involves a mandatory, statutory exhaustion requirement, which allows for no such exceptions. *See Bastek*, 145 F.3d at 95 (rejecting application of various exceptions to exhaustion requirement where clear statutory requirement exists); *Theodoropoulos v. INS*, 358 F.3d 162, 172 (2d Cir. 2004) (rejecting futility exception to exhaustion requirement in Immigration and Nationality Act because such an exception is "simply not available when the exhaustion requirement is statutory," as opposed to judicial); *United States v. Gonzalez-Roque*, 301 F.3d 39, 46-48 (2d Cir. 2002) (rejecting argument that statutory exhaustion requirement for collaterally attacking a removal order should be excused in light of defendant's *pro se* status in removal proceedings).

To be sure, *Washington v. Barr* states that: "Even where exhaustion is seemingly mandated *by statute or decisional law*, the requirement is not absolute. The Supreme Court itself has recognized exceptions to the exhaustion requirement under 'three broad sets of categories.'" *Washington*, 925 F.3d at 118 (emphasis added) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992)). But the inclusion of the phrase "by statute" is not supported by the citation that follows. *McCarthy* is another case involving a judge-made exhaustion requirement. *See McCarthy*, 503 U.S. at 152 ("Congress has not *required* exhaustion of a federal prisoner's *Bivens* claim."). It thus provides no support for the notion that exhaustion mandated "by statute" is not absolute. *See Bastek*, 145 F.3d at 95 (rejecting application of *McCarthy* exceptions in a statutory case). Further, when *Washington* goes on to discuss three recognized exceptions to exhaustion, it is describing three exceptions recognized in *McCarthy* in the judge-made context. But as the Supreme Court made crystal clear in *Ross*, this ignores the critical distinction between statutory and judge-made exhaustion requirements. Given that *Washington* was a judge-made exhaustion case, its statement that exhaustion mandated "by statute" is "not absolute" is dicta, and cannot supplant the clear statements to the contrary in cases like *Ross* and *Bastek*. Thus, Judge Torres erred by citing *Washington*'s discussion of judge-made exceptions to a judge-made exhaustion rule to justify excusing exhaustion under Section 3582(c). *See United States v. Perez*, 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020) (relying on *Washington*).

In sum, the analysis of a statutory exhaustion requirement must "begin[] with the text" and utilize "ordinary interpretive techniques." *Ross*, 136 S. Ct. at 1856 and 1858 n.2. As set forth above, the text of Section 3582(c) provides for no exceptions. The defendant admits that he requested compassionate release with the BOP on the same date that he filed his motion with this

Court. The defendant concedes that he has failed to satisfy the mandatory exhaustion requirements. The Court should deny his motion on that basis alone.[3]

### B.  The Court Does Not Have the Authority to Grant the Requested Relief

The Government respectfully submits that the requested relief—namely, placing the defendant on home confinement temporarily and then returning the defendant to prison to serve the remainder of his term—is not legally permissible under Section 3582(c). The Government's research has uncovered no case in which a court ordered such a result under this statute. Nevertheless, the Government respectfully submits that the relief would be plainly inconsistent with the language of the statute, the purpose of compassionate release, and the case law interpreting Section 3582(c).

Section 3582(c) states that a court "may not modify a term of imprisonment once it has been imposed," except that, as relevant here, a court "may *reduce* the term of imprisonment" if the requirements of compassionate release are satisfied. 18 U.S.C. § 3582(c)(1)(A) (emphasis added). The same language is used in Section 3582(c)(2), the provision that governs when the United States Sentencing Commission has retroactively lowered a Sentencing Guidelines range; if certain requirements are met, a court "may reduce the term of imprisonment" imposed on such a defendant. In that context, the Supreme Court has explained that a court's authority under Section 3582(c)(2) is "limited" to the power to "reduce" a term of imprisonment. *Dillon v. United States*, 560 U.S. 817, 825 (2010). "By its terms, § 3582(c)(2) does not authorize a sentencing or resentencing proceeding. Instead, it provides for the modification of a term of imprisonment by giving courts the power to 'reduce' an otherwise final sentence in circumstances specified by the Commission." *Id.* (internal quotation marks and alterations omitted); *see United States v. Urso*, 2019 WL 5423431, at *1 (E.D.N.Y. Oct. 23, 2019) (holding that Section 3582(c) "authorizes the court to modify a *term* of imprisonment, it does not authorize the court to alter the method of incarceration.").

The Government respectfully submits that ordering the defendant temporarily released to home confinement for a period, to be followed by incarceration for the remainder of his sentence, would constitute imposition of a new sentence, rather than reducing a sentence, and is not legally permissible. Such relief would also be inconsistent with the plain purpose of the compassionate release regime, which is to terminate early the incarceratory portion of a sentence for an inmate whose health has deteriorated sufficiently severely or whose life circumstances have otherwise changed in certain delineated ways. The relief requested by the defendant is more accurately viewed as a functional grant of bail or a court-ordered re-designation of the location at which a sentence will be served—each of which this Court is without authority to order at this juncture.

---

[3] In the course of responding to compassionate release motions made during the current COVID-19 pandemic, the Government has, in very limited circumstances of the sort not present here, chosen not to assert the exhaustion defense for certain defendants. *See, e.g.*, *United States v. Tia Jasper*, 18 Cr. 390 (PAE) (S.D.N.Y. Apr. 6, 2020), dkt. no. 441 (order granting compassionate release). The Government has elected not to waive the exhaustion requirement in this case.

At least one judge of this Court has recently concluded that such relief is not possible under Section 3582(c). *See United States v. Credidio*, No. 19 Cr. 111 (PAE), ECF No. 66 (S.D.N.Y. Apr. 2, 2020) (concluding, in ruling on motion for compassionate release under Section 3582(c) and/or habeas corpus under Section 2241, that court is "powerless to order [defendant] temporarily released from custody until circumstances improve," but observing that BOP does have such authority including furloughs under Section 3622, among other grounds).

Accordingly, the Government respectfully submits that the requested relief cannot be granted under Section 3582(c).

### C. The Defendant Has Not Set Forth Extraordinary and Compelling Reasons Warranting Relief under Section 3582(c)

Even if the defendant had satisfied the administrative exhaustion requirement and had requested relief that the Court had the authority to grant (which he has not, as explained above), the defendant's motion should be denied. The defendant has not provided any medical records corroborating that he has asthma, does not claim that he has moderate to severe asthma, and does not describe how his release would reduce the risk of his being susceptible to COVID-19. Further, in light of the seriousness of his crime, the amount of time he has served, and his personal history and characteristics a modification of his sentence is not warranted.

The same Section 3553(a) factors that the Court considered in imposing the defendant's original sentence, only approximately two months ago, continue to justify that sentence today and weigh heavily against the defendant's release on home confinement. The defendant committed an incredibly serious offense involving the sale of dangerous substances. His involvement in the Boss Crew's drug dealing was harmful to the public and, while he was not personally involved in carrying out violence on behalf of the Boss Crew, other members of the crew committed significant acts of violence that were a direct result of the extensive drug operation in which the defendant participated. The defendant further possessed a gun, attempted to obtain ammunition for that gun, and tried to get access to another type of gun to ensure that he could be armed with a loaded firearm. The defendant explained to one of his co-conspirators hat he wanted to "break . . . [the] body" of someone who owed him thirty-one dollars. The defendant acknowledged that it was not a large debt but that violence was necessary because of the "principle"—that he had not been repaid. And the defendant engaged in this offense conduct while on state probation and even after he had already been convicted of a firearms offense. The defendant was sentenced for his offense to 50 months' imprisonment, which was below the stipulated Guidelines range of 70 to 87 months' imprisonment.

The sentence reduction now requested by the defendant to time served after having been incarcerated for less than half of his 50-month sentence of imprisonment would fail entirely to satisfy any of the purposes of sentencing—here, principally the seriousness of the offense, the defendant's role, and the need for specific and general deterrence—and would not be appropriate. *See, e.g., United States v. Butler*, 18 Cr. 834, dkt. no. 461 (S.D.N.Y. Apr. 7, 2020) (denying motion for compassionate release in light of COVID-19 for defendant with asthma and heart condition where defendant was a danger to safety of others and had only served 15 months of 60 month sentence); *Credidio*, 19 Cr. 111 (PAE), dkt. no. 62 (denying motion for compassionate release and

reduction of sentence to home confinement in light of COVID-19 pandemic for 72-year old defendant sentenced in Feb. 2020 to 33 months' imprisonment because lengthy term of imprisonment was required for reasons stated at sentencing); *accord id.* dkt. no. 66 (S.D.N.Y. Apr. 2, 2020) (denying § 2241 habeas petition and concluding that court was without power to act, while noting the availability of various remedies within the BOP and urging the defendant to seek those remedies);

The defendant's assertion that he has asthma is plainly insufficient to warrant his release. The defendant has not provided any medical records to support his statement that he currently has asthma. The defendant further proffers no details about the severity of his asthma, including whether he has ever had an attack or whether he has experienced any asthma symptoms recently. Although the Centers for Disease Control and Prevention has indicated that individuals with moderate to severe asthma may be at a higher risk, the defendant himself does not describe his asthma as moderate or severe and provides no details to suggest that would be the case. The defendant—who is only 27 years old—does not argue that he has any other health risks. He, further, does not allege that he has been exposed to any individuals with COVID-19 or that his medical needs are not presently being met. At most, therefore, the defendant offers speculation both that he is more likely to suffer adverse health consequences if he remains in prison and that the prison would be unable to attend to such adverse health consequences if they arose. These speculative assertions fall well short of supporting his sentence reduction in this case.

In the context of even pre-trial bail applications, courts in this district have routinely denied release based on generalized arguments about COVID-19 when a defendant alleges that he has asthma. *See, e.g.*, *United States v. Estevez Gonzalez*¸19 Cr. 123 (S.D.N.Y. Mar. 25, 2020) (Buchwald, J.) (denial of pretrial bail for inmate with history of asthma who failed to provide medical records); *United States v. Rivera*, 20 Cr. 6 (S.D.N.Y. Mar. 25, 2020) (Rakoff, J.) (denial of pretrial bail for inmate detained in MCC on controlled substance charge who had a childhood history of asthma); *United States v. Decker*, 20 Cr. 104 (S.D.N.Y. Mar. 27, 2020) (Davison, M.J.) (denial of bail application for inmate with pre-existing heart and liver issues and acute asthma); *United States v. Fofana*, 19 Cr. 447 (S.D.N.Y. Mar. 30, 2020) (Cote, J.) (denial of bail application for defendant with asthma); *United States v. Chambers*, 20 Cr. 135 (S.D.N.Y. Mar. 31, 2020) (Furman, J.) (denial of pretrial bail for inmate diagnosed with asthma); *United States v. Roberson*, 19 Cr. 914 (S.D.N.Y. Apr. 3, 2020) (Buchwald, J.) (denial of pretrial bail for inmate who stated he had asthma and failed to provide medical records).

The defendant cites to *United States v. Kintea McKenzie*, 18 Cr. 834 (S.D.N.Y.) (PAE), dkt. no. 442, as support for his release based on his asthma condition. There, the court granted pre-trial release to a defendant who was asthmatic, had been prescribed an inhaler by the MCC, and had filed a motion arguing that he was concerned about his exposure at the MCC. But following the defendant's placement on home incarceration, the defendant violated the terms of his release, attending a party in close proximity to other individuals. The court decided not to remand the defendant, only because it might increase exposure to others at MCC. *See id.*, dkt. no. 457 ("To remand him now would potentially expose United States marshals, BOP officials, fellow MCC inmates, and others in his presence to the virus. These persons, including the other inmates, deserve better."). Every defendant is different. But that case highlights yet another reason for requiring that truly "extraordinary and compelling reasons" are presented to the Court for the

defendant's release—if the defendant violates, given that his exposure to COVID-19 will be uncertain at best, the Court's ability to remand him or otherwise impose a remedy will be limited.

The defendant further appears to argue that the BOP has not taken sufficient steps to address COVID-19 and that the BOP's purported failure to act violates the defendant's Eighth Amendment and Due Process rights, which also warrants his compassionate release. This claim also does not serve as an "extraordinary or compelling" reason to place the defendant on home confinement. The virus, of course, presents new and complex challenges for protecting inmates' health. But the MDC, like other jails around the region, has taken measures to protect inmates, including new regulations designed to reduce large gatherings, to ensure that common areas are sanitized, and to screen new inmates for signs of COVID-19.

Updates regarding the number of positive inmates and staff at the MDC and other local detention facilities, are now publicly available online. *See* https://www.nyed.uscourts.gov/coronavirus. As of April 7, 2020, three inmates at the MDC have tested positive for COVID-19. Currently, MDC inmates are remaining in their assigned cells for a 14-day period as part of a coordinated BOP action plan to contain the virus in federal facilities nationwide. However, three days per week, inmates will be released from their cells to shower, use the telephones, and use the BOP e-mail system, while adhering to BOP-encouraged policies for social distancing. (*See* April 7, 2020 Update Letter from Wardens of MCC and MDC, at 2). The April 7 report from the institution further details the steps taken by BOP staff to safeguard inmates and to mitigate the virus's spread, including temperature checks, quarantine measures, and cleaning protocols. *See id.*

This report confirms the information that the Government has received from BOP to date that the MDC—and all BOP institutions—have implemented a coordinated response to address the COVID-19 pandemic. *See* Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. Since at least October 2012, BOP has had a Pandemic Influenza Plan in place. *See BOP Health Management Resources*, available at https://www.bop.gov/resources/health_care_mngmt.jsp. [4] Moreover, beginning approximately two months ago, in January 2020, BOP began to plan specifically for coronavirus/COVID-19 to ensure the health and safety of inmates and BOP personnel. *See Federal Bureau of Prisons COVID-19 Action Plan*, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. As part of its Phase One response to coronavirus/COVID-19, BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id.* In addition, BOP stood up "an agency task force" to study and coordinate its response to coronavirus/COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ)

---

[4] *See also Module 1: Surveillance and Infection Control*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf; *Module 2: Antiviral Medications and Vaccines*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_2.pdf; *Module 3: Health Care Delivery*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf; *Module 4: Care for the Deceased*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_4.pdf.

and the Office of the Vice President. BOP's planning is structured using the Incident Command System (ICS) framework." *Id.*

On March 13, 2020, the BOP, in coordination with the Department of Justice ("DOJ") and the White House, implemented its Phase Two response "in order to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id.* BOP's national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.* For example, BOP (a) suspended social visits for 30 days (but increased inmates' access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmates' movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id.* On April 1, 2020, BOP implemented Phase Five of its COVID-19 action plan, which will keep all inmates secure in their cells and quarters for a 14-day period to minimize the spread of the virus.

Moreover, as part of BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined"; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id.* Additionally, staff members and contractors are screened upon entry, including taking each individual's temperature, asking each individual a series of health-related questions, and denying entrance to the institution by anyone who poses a health risk. Inmates exhibiting flu-like symptoms are separated from the general population and tested for COVID-19 in accordance with local health authority protocols.

These and other steps were outlined in a March 18, 2020 letter from the BOP to Chief Judge Colleen McMahon in response to questions regarding the MDC's (and Metropolitan Correctional Center's) institutional responses to COVID-19. The institution's swift action and strict containment and mitigation measures to date undermine the defendant's suggestion that the MDC is ill-prepared to manage COVID-19.

While it is true that the MDC itself is a densely occupied detention facility, it is also by its very nature isolated from the outside world and has taken extensive steps to limit any spread. Such relative isolation has, if anything, been increased by the COVID-19 outbreak because, in response to the outbreak, the MDC has taken steps to limit contact by visitors to the inmates. As described above, the latest information we have from the MDC is that only three inmates have tested positive for COVID-19. This limited spread does not mean that other inmates will not contract the virus, but it indicates that, to date, the spread is slower in the MDC than in many areas of the greater-New York community.

It is unclear that the speculative risk of contracting COVID-19 is even enhanced by remaining at the MDC as opposed to a residence in New York City if the defendant were to be released. By contrast, the defendant has proffered no facts about the residence to which he would be released—the relative isolation of that residence; any measures taken where that residence is located to limit the spread of COVID-19; and, if other residents present have tested positive for COVID-19 or manifested any symptoms related to COVID-19. The defendant similarly has not proffered how his access to medical care would be improved by residing outside the MDC if he contracted COVID-19.

## IV. Conclusion

The Court should deny the defendant's motion on the basis that he has failed to exhaust his administrative remedies and seeks relief that the Court does not have the authority to grant. Even if the Court had such authority, it should deny the defendant's motion because the defendant has not demonstrated an "extraordinary and compelling" reason to modify his sentence to time served for a serious crime for which he has served less than one-half of his term of incarceration.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____
Elinor L. Tarlow
Matthew J.C. Hellman
Karin Portlock
Assistant United States Attorneys
(212) 637-1036/2278/1589

Cc: Dawn Cardi, Esq. (by ECF/email)