UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-

TYREEK OGARRO,

                    Defendant.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/14/2020

No. 18-cr-373-9 (RJS)
OPINION & ORDER

RICHARD J. SULLIVAN, Circuit Judge:

    By letter dated April 3, 2020, Defendant Tyreek Ogarro moved for compassionate release under the First Step Act of 2018, 18 U.S.C. § 3582(c)(1)(A), in light of the COVID-19 pandemic. (Doc. No. 644 ("Ogarro Ltr.").) The government opposes his motion. (Doc. No. 650 ("Gov't Ltr").) Because Ogarro has not yet exhausted his administrative remedies, his request is DENIED without prejudice.

## I. Background

    From March 2018 until June 2018, Ogarro was a member of a drug trafficking organization known as the "Boss Crew," which operated in the Bedford Stuyvesant neighborhood of Brooklyn, New York. (Presentence Investigation Report ¶ 11 ("PSR").) Over those three months, Ogarro distributed approximately 157 grams of cocaine base and approximately 20 grams of fentanyl. (*Id.* ¶ 28.) Ogarro's participation with the Boss Crew ended on June 6, 2018, when he was arrested along with several other members of the organization. (*Id.* ¶ 41.) Since then, Ogarro has been detained at the Metropolitan Detention Center (the "MDC") in Brooklyn.

    On May 14, 2019, Ogarro pleaded guilty pursuant to a plea agreement with the government to one count of conspiring to distribute cocaine base in violation of 28 U.S.C. §§ 841(b)(1)(C) and 846. (Doc. No. 358.) According to the plea agreement, the parties stipulated to a Sentencing

Guidelines range of 70 to 87 months' imprisonment. The PSR likewise concluded that the advisory Guidelines range was 70 to 87 months' imprisonment (PSR ¶ 104), and recommended that the Court impose a sentence of 60 months, (*id.* at pg. 25). Nevertheless, on February 4, 2020, the Court sentenced Ogarro below that range to 50 months' imprisonment, in light of, among other things, Ogarro's role in the offense, his lack of youthful guidance, his remorse, his status as a non-violent offender, and his pre-sentence rehabilitation. (Doc. No. 609 at 2.) Ogarro has served approximately 22 months of that sentence thus far. (Gov't Ltr. at 2.)

On April 3, 2020, Ogarro requested that the Court order his "immediate temporary release to home confinement pursuant to 18 U.S.C. § 3582(c)(1)(A)" because of the current COVID-19 pandemic. (Ogarro Ltr. at 1.) He clarified that although release under section 3582(c) is often permanent, he is amenable to a "temporar[y]" release "to continue to serve his sentence under strict home detention" until after the COVID-19 pandemic subsides. (*Id.* at 5.)

Ogarro argues that the MDC is ill-equipped to limit the spread of COVID-19 among inmates, which is particularly dangerous to him because he is asthmatic and therefore at acute risk for severe illness if infected.[1] Because of the urgency of his request, Ogarro did not wait 30 days after seeking relief from the Bureau of Prisons (the "BOP"), but sought relief through the BOP and this Court simultaneously. (Ogarro Ltr. at 2.) In any event, he posits that even "if the BOP did take any action, it would deny [his] requested relief." (Doc. No. 658 at 6 ("Ogarro Reply").)

The government opposes Ogarro's request, arguing that (i) the Court cannot provide relief under section 3582(c)(1)(A) because Ogarro has not exhausted his administrative remedies (Gov't Ltr. at 3–7); (ii) the statute does not contemplate "temporary" relief (*id.* at 7–8); and, in any event,

---

[1] According to his PSR, Ogarro "was diagnosed with asthma as a child and still uses an inhaler when he exercises." (PSR ¶ 79.) Ogarro has informed the Court that his asthma has been classified as "Level II." (Ogarro Ltr. at 3.)

2

(iii) Ogarro has not demonstrated extraordinary and compelling reasons warranting relief under section 3582(c)(1)(A) (*id.* at 8–12).

## II. Discussion

"[A] court may not modify a term of imprisonment once it has been imposed except pursuant to statute." *United States v. Roberts*, No. 18-cr-528 (JMF), 2020 WL 1700032, at *1 (S.D.N.Y. Apr. 8, 2020) (quoting *United States v. Gotti*, No. 02-cr-743 (CM), 2020 WL 497987, at *1 (S.D.N.Y. Jan. 15, 2020)). Section 3582(c)(1)(A) provides one such exception, often referred to as "compassionate release." Through that provision, a court may "reduce" a defendant's sentence where "extraordinary and compelling reasons warrant such a reduction," and such relief would be consistent with both the factors in 18 U.S.C. § 3553(a) and "applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

Until recently, a court could not order compassionate release unless the BOP made an affirmative request on a prisoner's behalf. *See* U.S.S.G. § 1B1.13. In December 2018, however, Congress passed the First Step Act, which did away with that long-standing restriction. But while the First Step Act stripped from the BOP the ability to unilaterally deny a prisoner compassionate release, it did not remove the BOP from the process entirely. Without a motion from the BOP, a court "may not" grant compassionate release unless the defendant either (i) "fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on [his] behalf" or (ii) waited "30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

Requiring would-be litigants to exhaust their administrative remedies before ascending the courthouse steps serves several purposes. It protects administrative agency authority by guaranteeing agencies the "opportunity to correct [their] own mistakes." *Woodford v. Ngo*, 548

U.S. 81, 89 (2006) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)).  It also promotes efficiency, as claims "generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." *Id.*

Ogarro admits that he did not satisfy either of section 3582(c)'s exhaustion requirements. Nevertheless, he argues that the Court may "waive" unilaterally the statute's 30-day waiting period because of the exigencies caused by the COVID-19 pandemic.  (Ogarro Reply at 5.)  But whether the Court possesses such power depends on the nature of the statute's exhaustion requirement. *United States v. Monzon*, No. 99-cr-157 (DLC), 2020 WL 550220, at *1 (S.D.N.Y. Feb. 4, 2020) ("The provenance of an administrative exhaustion requirement determines its scope.").

There are two types of exhaustion requirements:  jurisdictional ones and non-jurisdictional ones.  Jurisdictional exhaustion requirements "govern a court's adjudicatory authority" and are not subject to any exceptions.  *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) (internal quotation marks omitted).  By contrast, non-jurisdictional requirements – sometimes referred to as "claim-processing rules" – may be "forfeited if the party asserting the rule waits too long to raise the point."  *Fort Bend County v. Davis*, 139 S. Ct. 1843, 1849 (2019) (internal quotation marks omitted).

The Supreme Court has further distinguished between two varietals of claim-processing rules:  rules created by express statutory directive and judge-made rules.  While the former are "mandatory," the latter are "amenable to judge-made exceptions." *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016).  In other words, a timely asserted mandatory claim-processing rule must be strictly enforced by courts even though it is not a jurisdictional bar; only where a claim-processing rule is judge-made can a court waive its requirements.  *Id.*  Accordingly, given the government's timely objection for lack of exhaustion, this Court may "waive" Ogarro's failure to exhaust his

available administrative remedies only if section 3582(c)'s exhaustion requirements are judge-made claim-processing rules.

The Second Circuit has provided little guidance on whether section 3582(c)'s exhaustion requirements are jurisdictional.[2] *See Monzon*, 2020 WL 550220, at *2. The Court is mindful, however, that the Supreme Court has repeatedly "cautioned against the overuse of the term 'jurisdiction' or 'jurisdictional'" in interpreting the scope of statutory rules. *United States v. Johnson*, 732 F.3d 109, 116 n.11 (2d Cir. 2013); *see also Fort Bend County*, 139 S. Ct. at 1850; *Gonzalez*, 565 U.S. at 141–42; *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 160–62 (2010); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 510–11, 515 (2006); *Kontrick v. Ryan*, 540 U.S. 443, 454–55 (2004). Perhaps as a result, some courts in this district have concluded that section 3582(c) is a non-jurisdictional claim-processing rule. *E.g.*, *United States v. Gentille*, No. 19-cr-590 (KPF), 2020 WL 1814158, at *2–4 (S.D.N.Y. Apr. 9, 2020). Here, Ogarro and the government appear to agree that section 3582(c) is such a claim-processing rule. (Ogarro Reply at 3–4; Gov't Ltr. at 7 n.3 (asserting that the government may "waive" the exhaustion requirement in certain cases).). But regardless of whether the statute is jurisdictional or a claim-processing rule, its exhaustion requirements are clearly mandatory. *See Monzon*, 2020 WL 550220, at *2 (concluding that it is "unnecessary to resolve . . . whether § 3582(c) creates a jurisdictional bar").

---

[2] The circuits that have addressed this question are split. *Compare United States v. Graham*, 704 F.3d 1275, 1279 (10th Cir. 2013) (considering section 3582(c) a jurisdictional rule), *United States v. Austin*, 676 F.3d 924, 930 (9th Cir. 2012), *United States v. Williams*, 607 F.3d 1123, 1125–26 (6th Cir. 2010), *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010), *and United States v. Auman*, 8 F.3d 1268, 1271 (8th Cir. 1993), *with United States v. May*, 855 F.3d 271, 274–75 (4th Cir. 2017) (considering section 3582(c) a claim-processing rule), *United States v. Caraballo-Martinez*, 866 F.3d 1233, 1245 (11th Cir. 2017), *United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015), *and United States v. Weatherspoon*, 696 F.3d 416, 421 (3d Cir. 2012). That said, the split may be somewhat overstated, as several of the decisions address whether courts have jurisdiction to consider successive petitions. That issue is at least partially distinct from whether courts have jurisdiction to consider a petition that fails to meet the statutory requirements. *Compare Garcia*, 606 F.3d at 212 n.5 (acknowledging that the terms of section 3582(c) are jurisdictional in nature), *with United States v. Calton*, 900 F.3d 706, 710 (5th Cir. 2018) (noting that "whether a district court has jurisdiction to consider a *successive* § 3582(c)(2) motion" is a distinct issue from *Garcia*).

In fact, section 3582(c)'s exhaustion proscription is clear as day. *See United States v. Woodson*, No. 18-cr-845 (PKC), 2020 WL 1673253, at *2 (S.D.N.Y. Apr. 6, 2020) ("The plain language of [section 3582(c)(1)(A)] is free from ambiguity."). It mandates that where the BOP has not submitted an application for a sentence reduction, a court cannot, under any circumstances, grant compassionate release unless the defendant has either "fully exhausted all administrative rights to appeal" or waited at least 30 days from the receipt of such a request by the warden of the defendant's facility. *See* 18 U.S.C. § 3582(c)(1)(A); *see also Roberts*, 2020 WL 1700032, at *2. Because the statutory language is unambiguous and mandatory, it must be "strictly enforce[d]." *Theodoropoulos v. INS*, 358 F.3d 162, 172 (2d Cir. 2004). Numerous courts within this circuit that have considered the issue have reached the same conclusion. *E.g. Roberts*, 2020 WL 1700032, at *2–3; *Woodson*, 2020 WL 1673253, at *4; *Monzon*, 2020 WL 550220, at *2; *United States v. Hernandez*, No. 19-cr-834 (PAE), 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020); *United States v. Cohen*, No. 18-cr-602 (WHP), 2020 WL 1428778, at *2 (S.D.N.Y. Mar. 24, 2020). And at least one Court of Appeals has agreed. *See United States v. Raia*, No. 20-1033, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020) (concluding that the exhaustion requirement "presents a glaring roadblock foreclosing compassionate release at this point").

Ogarro disagrees – he argues that even if section 3582(c) is a mandatory claim-processing rule, it is "subject to equitable defenses and can be waived by courts." (Ogarro Reply at 4.) For support, he points to several cases that he sees as providing the Court such broad authority. Moreover, he argues that courts routinely employ this authority and identifies several examples of statutes with "mandatory" exhaustion requirements that nonetheless feature judge-made exceptions. Neither argument has merit.

Ogarro relies principally on *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019), which states that "[e]ven where exhaustion is seemingly mandated by statute or decisional law, the requirement is not absolute." (Ogarro Reply at 4–5.) But *Washington* "is not a statutorily-mandated exhaustion case." *Woodson*, 2020 WL 1673253, at *3. Rather, it concerned a judge-made exhaustion requirement to the Controlled Substances Act, which, though not "expressly mandate[d]" by the statute's text, was created as a "prudential rule of judicial administration" that was "consistent with congressional intent." *Washington*, 925 F.3d at 115–16. As a result, the Second Circuit's reference to exhaustion requirements "*seemingly* mandated by statute," *id.* at 118 (emphasis added), is best understood to regard judge-made requirements that "seem" consistent with statutory purpose and congressional intent, though not located in the statutory text. In other words, the statement speaks only to exhaustion requirements implied by a statute's structure and purpose, not to requirements that are expressly provided for in the statute itself. This interpretation is further supported by *Washington*'s reliance on *McCarthy v. Madigan*, which itself concerned a judge-made exhaustion requirement. *See* 503 U.S at 144. In any event, even if Ogarro's broader interpretation of *Washington* were correct, the statement "was not necessary to the Court of Appeals' holding" and is therefore non-binding dicta. *Woodson*, 2020 WL 1673253, at *3 (concluding that *Washington* does not provide authority to waive section 3582(c)'s exhaustion requirement).

Without support from the Second Circuit, Ogarro falls back on several recent district court cases that have applied judge-made exceptions to section 3582(c). *E.g.*, *United States v. Zukerman*, No. 16-cr-194 (AT), 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020); *United States v. Perez*, No. 17-cr-513 (AT), 2020 WL 1546422 (S.D.N.Y. Apr. 1, 2020).[3] Those cases themselves

---

[3] Ogarro cites one additional case from within our circuit for the same proposition. *See* Order, *United States v. Marin*, No. 15-cr-252 (PKC) (E.D.N.Y. Mar. 30, 2020), ECF No. 1326. But in *Marin*, the court held that the exhaustion

7

rely on *Washington v. Barr*. *See Zukerman*, 2020 WL 1659880, at *3 & n.2; *Perez*, 2020 WL 1546422, at *2 & n.2. And while those cases also find support in *Mathews v. Eldridge*, 424 U.S. 319 (1976), *Eldridge* is simply inapplicable here. For starters, the relief sought in *Eldridge* was "entirely collateral to [the] substantive claim of entitlement." 424 U.S. at 330. Here, by contrast, Ogarro's claims before the Court are not collateral to his claims raised with the BOP – they are identical. Next, and more fundamentally, *Eldridge* concerned the Social Security Act, which uses "flexib[le]" exhaustion language that is nothing like the "substantially more restrictive" language found in section 3582(c). *Roberts*, 2020 WL 1700032, at *2

Likewise, the statutes Ogarro points to as examples of mandatory claim-processing rules that courts have waived offer scant support. As *Ross* makes clear, where one statute's text and legislative history gives leeway to judge-made exceptions, others may not. *See* 136 S. Ct. at 1858 n.2 ("[A]n exhaustion provision with a different text and history from § 1997e(a) might be best read to give judges the leeway to create exceptions or to itself incorporate standard administrative-law exceptions. The question in all cases is one of statutory construction . . . ." (internal citation omitted)). Thus, even if the Court were to accept that claim-processing rules in some statutes may be waived, that exception would be available only on a statute-by-statute basis. And there is no indication that the statutes identified by Ogarro bear any similarity to section 3582(c).

Consider three of the statutory schemes on which Ogarro relies: Title VII, the Social Security Act, and habeas relief. (Ogarro Reply at 5.) Judge Furman recently debunked the notion that the exhaustion requirements in the first two statutes bear any resemblance to the requirements found in section 3582(c). *See Roberts*, 2020 WL 1700032, at *2. For instance, Title VII's exhaustion rule was "intended to operate as a statute of limitations and thus, like a statute of

---

requirement could be waived because "the government . . . consent[ed] to the requested sentencing reduction." *Id.* The government has not consented to a waiver here.

limitations, is subject to waiver, estoppel, and equitable tolling." *Id.* (internal quotation marks omitted). Likewise, as addressed above, the Social Security Act uses far more permissive language than section 3582(c). *Id.* The habeas statute is an equally poor reference point, since it essentially codifies judge-made law that historically permitted certain exceptions to the exhaustion requirement. *See Granberry v. Greer*, 481 U.S. 129, 133–34 (1987). Moreover, the statute itself allows courts to waive exhaustion where "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B)(ii).

With no textual basis on which to rely, Ogarro's argument ultimately boils down to a pragmatic insistence that a 30-day waiting period is simply too long to wait in the current health crisis. But there is nothing in the First Step Act or its history to suggest that courts may modulate the exhaustion waiting period when they see fit. In fact, the swiftness of recent congressional action suggests just the opposite.

On March 19, 2020, in response to the COVID-19 pandemic, Congress enacted the CARES Act, Pub. L. No. 116-136 (2020). That statute includes certain provisions specifically designed to redress Ogarro's concern that prisons will see high viral transmission rates. Specifically, the CARES Act provides that "if the Attorney General finds that emergency conditions will materially affect the functioning of the [BOP], the Director of the [BOP] may lengthen the maximum amount of time for which the [BOP] Director is authorized to place a prisoner in home confinement" under 18 U.S.C. § 3624(c)(2).[4] CARES Act § 12003(b)(2). Clearly, Congress recognized the danger that COVID-19 poses to inmates and determined that the problem required a centralized response by a specialized agency in the executive branch, not piecemeal consideration by courts. It is not

---

[4] The Attorney General has made such a finding regarding the emergency conditions that now exist as a result of COVID-19. *See* Memorandum from Att'y Gen. William Barr to Dir. of Bureau of Prisons (Apr. 3, 2020), https://www.justice.gov/file/1266661/download.

this Court's place to second guess Congress's policy determination. *See Ross*, 136 S. Ct. at 1855, 1857 (holding that "Congress sets the rules" and courts are not free to create "freewheeling" exceptions).

Accordingly, because Ogarro has failed to exhaust his administrative remedies, the Court must deny his motion.[5]

\*   \*   \*

Though the Court is denying Ogarro's motion, that does not mean that Ogarro is out of options. There exist two potential remedies that can offer him the type of relief that he is seeking. The first is a furlough under 18 U.S.C. § 3622. As at least one other court has acknowledged, section 3622 "would provide a means to release [Ogarro] until the threat posed by COVID-19 subsides and [he] c[an] be safely returned to prison to finish h[is] sentence." *Roberts*, 2020 WL 1700032, at \*3. The second is the authority the CARES Act and the Attorney General have given to the BOP to permit prisoners to finish the remainder of their sentence in home confinement. *See* 18 U.S.C. § 3624(c)(2). Significantly, both of these remedies are exclusively within the discretion of the BOP; the Court lacks authority to order either one. Nevertheless, the Court trusts that the BOP will act with appropriate sensitivity to inmates, like Ogarro, who suffer from asthma and

---

[5] What is more, the Court is skeptical that it has the ability to grant the relief Ogarro seeks: a temporary compassionate release that would end once the COVID-19 pandemic subsides. *See Roberts*, 2020 WL 1700032, at \*3 ("At most, Section 3582(c) allows a court to '*reduce*' a term of imprisonment if the requirements for compassionate release are satisfied. By its plain terms, therefore, the statute does not permit the Court 'to order [Ogarro] temporarily released from custody until circumstances improve.'" (internal citations omitted)).

other high-risk comorbidities, particularly when they are housed in facilities, like the MDC, that are likely to experience large numbers of COVID-19 infections.

### III.  Conclusion

For the reasons set forth above, Ogarro's motion is DENIED without prejudice.  The Clerk of Court is respectfully directed to terminate the motion pending at document number 644, and the government is directed to serve a copy of this order on the warden of the MDC and to the Regional Counsel of the BOP.

SO ORDERED.

Dated:         April 14, 2020
               New York, New York

RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation